IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN TAMBURELLO,<br>    Plaintiff,<br><br>    v.<br><br>CITY OF ALLENTOWN,<br>    Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Civil No. 5:20-cv-06153-JMG |

**MEMORANDUM OPINION**

**GALLAGHER, J.**                              February 7, 2022

    Plaintiff John Tamburello ("Tamburello") claims that Defendant City of Allentown ("City") terminated his employment as a probationary police officer because of his race and national origin, and otherwise treated Caucasian police officers more favorably. The City now moves for summary judgment on Tamburello's discrimination claims.

    Tamubrello has not established a prima facie case of discrimination, so summary judgment is warranted in the City's favor. Tamburello's prima facie case relies on comparator evidence—that is, evidence of Caucasian officers within the Allentown Police Department ("APD") who allegedly received more favorable treatment under similar circumstances. A plaintiff and his comparators must be similarly situated in all relevant aspects; here, there are meaningful distinctions between Tamburello and his proposed comparators. First, at the time of Tamburello's alleged misconduct, he had not yet cleared his probationary period, while all of his comparators were tenured officers. Second, Tamburello and two of the proffered comparators either held different positions or were supervised by different decision-makers. Finally, and perhaps most importantly, Tamburello's disciplinary record differs in kind from those of his comparators. Across two separate incidents, Tamburello was accused of violating the APD's use of force, body-

worn camera, and truthfulness policies. While several of the comparators were also charged with policy violations, their conduct was not of comparable seriousness—both in quantity and in severity—to that of Tamburello. For those reasons, Tamburello's comparator evidence fails, and the Court accordingly grants the City's motion.

I.     **FACTUAL BACKGROUND**[1]

Tamburello is a Hispanic male of Puerto Rican descent. Def.'s Statement of Undisputed Facts ¶ 3, ECF No. 17-6 [hereinafter "DSOF"]; Pl.'s Statement of Disputed Facts ¶ 3, ECF No. 18-2 [hereinafter "PSOF"]. In 2017, the City hired Tamburello as a police officer for the APD. DSOF ¶ 2; PSOF ¶ 2. Tamburello, like all new APD officers, was required to serve as a probationary officer for eighteen months. DSOF ¶ 6; PSOF ¶ 6. Probationary officers "may be disciplined, terminated, or laid off [for just cause] at any time at the sole discretion of the City." DSOF ¶ 7; PSOF ¶ 7.

Two incidents ultimately prompted Tamburello's termination from the APD. In January of 2019, an arrestee allegedly headbutted Tamburello. *See* J.A. 25. The Lehigh County District Attorney pursued aggravated assault charges against the arrestee. DSOF ¶ 52; PSOF ¶ 52. Before those charges were brought, Tamburello described the incident to an Assistant District Attorney as follows:

> The entire time [the arrestee is] ranting and raving. He's loud. He's bucking his body. He's charging at us. Like, he'll turn around and charge you and things – things like that. It was hard to control him. . . . And I'm holding the door open, and he charged at me and head-butt [*sic*] me, his head onto the left side of my face just above my cheek.

J.A. 435. The incident was captured on video. J.A. 341. The parties dispute whether the video

---

[1]     The parties filed a Joint Appendix of exhibits. *See* ECF Nos. 17-2, 17-3, 17-4, 17-5. The parties also filed supplements to the Joint Appendix. *See* ECF No. 18-3. The Court references the materials included in the Joint Appendix as "J.A."

2

accurately reflects Tamburello's description of the events.  *Compare* DSOF ¶ 59, *with* PSOF ¶ 59. While Tamburello maintains that he was in fact assaulted, an internal APD investigation into the episode concluded that "[t]he video does not show [the arrestee] charge or attack Officer Tamburello."[2]  J.A. 144.  The investigation further concluded that Tamburello may have committed several APD policy violations in connection with the incident.  J.A. 145–46.  More specifically, the APD found that Tamburello may have violated its use of force policy, for failing to file a use of force report; its body-worn camera policy, for failing to activate his body-worn camera; and its truthfulness policy.[3]  *Id.*

Officer Zachary Wittman, a white APD patrol officer who was present during the incident, was also investigated for, and charged with, potential misconduct.[4]  J.A. 147–48.  The APD specifically found that Wittman "failed to properly tag, label, and save recorded video" from his police vehicle.  J.A. 148.  There is no evidence, however, that Wittman was ever disciplined for this alleged policy violation.  *See* PSOF ¶ 63.

The second relevant incident occurred in February of 2019, when Tamburello responded to a burglary call.  DSOF ¶ 8; PSOF ¶ 8.  Tamburello and two other APD officers—Cory Marsteller, who is white, *see* J.A. 471, and Jose Ozoa, who is Hispanic, *see* J.A. 1220—converged on a vehicle containing the suspects.  DSOF ¶¶ 13–14; PSOF ¶¶ 13–14.  As the officers approached the vehicle, it suddenly accelerated and made contact with Tamburello's body.  DSOF ¶ 19; PSOF

---

[2]     The District Attorney ultimately dropped the aggravated assault charge against the arrestee. J.A. 144.

[3]     Tamburello's alleged violation of the truthfulness policy was twofold: first, for misrepresenting the incident to the Assistant District Attorney and, second, for later misrepresenting the incident to APD investigators.  *See* J.A. 146.

[4]     As part of that investigation, Wittman affirmed that "he did not" see the arrestee headbutt Tamburello.  J.A. 135.

3

¶ 19. All three officers then shot their firearms toward the vehicle: Tamburello fired eleven shots, Ozoa fired nine, and Marsteller fired one. DSOF ¶¶ 26–28; PSOF ¶¶ 26–28. One of Tamburello's shots struck a passenger in the rear seat of the vehicle. J.A. 47. The vehicle eventually crashed, and the suspects were apprehended. DSOF ¶¶ 31–33; PSOF ¶¶ 31–33. The shooting and subsequent chase were captured by dashcam video. *See* J.A. 170, 215, 222, 331, 346.

The City placed Tamburello, Ozoa, and Marsteller on administrative leave after the incident so that it could begin an investigation into potential violations of APD policy.[5] DSOF ¶¶ 35–37; PSOF ¶¶ 35–37. After reviewing the dashcam footage and interviewing Tamburello, Marsteller, and Ozoa, the City concluded that both Tamburello and Ozoa had potentially violated several APD policies. DSOF ¶¶ 41–42; PSOF ¶¶ 41–42; J.A. 164–68. More specifically, the APD found that Tamburello may have violated its use of force policy, for, *inter alia*, failing "to exercise utmost caution while discharging his firearm at the moving vehicle," J.A. 165; its body-worn camera policy, for not activating his body-worn camera; and its truthfulness policy, for making "unclear and contradictory" statements during the APD investigation.[6] J.A. 164–66. It found that Ozoa may have violated the use of force and body-worn camera policies. J.A. 166–68. Like Tamburello and Ozoa, Marsteller failed to record the incident on his body-worn camera. J.A. 166, 168. The City, however, exonerated Marsteller of any wrongdoing. J.A. 168.

---

[5]   The District Attorney performed its own investigation and determined that all three officers were justified in their use of deadly force. J.A. 28.

[6]   Namely, Tamburello first told APD investigators "that he remembered an old lady with her cell phone taping them" as he responded to the scene. J.A. 40. He later offered contradictory statements. *See* J.A. 43 ("I asked Officer Tamburello if he saw anyone in immediate danger when the vehicle was fleeing. His response was, 'see clearly, no.' He stated that it was more of him remembering people being there."); J.A. 48 ("Tamburello later indicates that there were no Officers or pedestrians in the immediate area.")

4

In May of 2019, the City held two *Loudermill* hearings[7] to determine whether Tamburello had indeed violated APD policy during the January and February incidents. DSOF ¶¶ 87, 89; PSOF ¶¶ 87, 89. Following the hearings, the City sustained each of Tamburello's alleged policy violations. J.A. 29–30. Tamburello's employment was therefore terminated, effective May 31, 2019. *Id.* Tamburello now alleges that "he received harsher discipline than white officers" because of his race and national origin. Compl. ¶¶ 57, 64, 82, ECF No. 1.

## II.   STANDARD

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Buj v. Psychiatry Residency Training*, 860 F. App'x 241, 243–44 (3d Cir. 2021). Facts are material if they "might affect the outcome of the suit under the governing law." *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute as to those facts is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (quoting *Anderson*, 477 U.S. at 248). "We view all the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Id.* (internal quotation marks and citation omitted).

The party moving for summary judgment must first "identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In response,

---

[7]   "*Loudermill* hearing refers to *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985), wherein the Supreme Court held that, prior to termination, an employee must be afforded notice and an opportunity for a hearing appropriate to the nature of the case." *Cormier v. Crestwood Sch. Dist.*, No. 3:19-1671, 2020 WL 6263027, at *1 n.1 (M.D. Pa. Oct. 23, 2020).

5

the nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Anderson*, 477 U.S. at 252).

### III. DISCUSSION

Tamburello brings race and national origin discrimination claims under Title VII, the Pennsylvania Human Relations Act ("PHRA"), and 42 U.S.C. § 1983. Compl. ¶¶ 53–65, 77–87. These discrimination claims follow the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999) (explaining that Title VII, PHRA, and section 1981 claims follow the *McDonnell Douglas* framework); *see also Edwards v. Albert Einstein Med. Ctr.*, 533 F. Supp. 3d 215, 220 n.2 (E.D. Pa. 2021).

That framework consists of three steps. "First, the plaintiff must establish a prima facie case of discrimination." *Edwards*, 533 F. Supp. 3d at 221. If the plaintiff sets out a prima facie case, "the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action." *Id.* (internal quotation marks and citation omitted). "Finally, the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual." *Id.* (internal quotation marks and citation omitted). "While the burden of production may shift, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Jones*, 198 F.3d at 410 (internal quotation marks and citation omitted).

### A. Prima Facie Case of Discrimination

A plaintiff establishes a prima facie case of race or national original discrimination by showing that he: "(1) is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) the circumstances of the adverse employment action give rise to an inference of discrimination." *Edwards*, 533 F. Supp. 3d at 221 (citing *Jones*, 198 F.3d at 410–11). "The plaintiff's burden at this stage is not onerous, as the goal is to eliminate[] the most common nondiscriminatory reasons for the defendant's actions; by doing so, the prima facie case creates an inference that the defendant's actions were discriminatory." *Whitmore v. Nat'l R.R. Passenger Corp.*, 510 F. Supp. 3d 295, 304 (E.D. Pa. 2020) (internal quotation marks and citation omitted).

The City does not dispute that Tamburello satisfies the first three prongs of his prima facie case. Rather, it argues that Tamburello cannot establish the fourth prong because the circumstances of his termination do not give rise to an inference of discrimination. *See* Def.'s Br. 8, ECF No. 17-1.

To establish the fourth prong, "a plaintiff may either: (1) introduce evidence of comparators (i.e., similarly situated employees who (a) were not members of the same protected class and (b) were treated more favorably under similar circumstances); or (2) rely on circumstantial evidence that otherwise shows a causal nexus between his membership in a protected class and the adverse employment action." *Greene v. Virgin Islands Water & Power Auth.*, 557 F. App'x 189, 195 (3d Cir. 2014) (citing *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 n.7 (3d Cir. 2003)).

Tamburello points to comparators in support of his prima facie case. "In order to demonstrate discrimination using comparator evidence, comparator employees must be similarly situated in all relevant respects, the determination of which takes into account factors such as the

employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in." *Mitchell v. Cmty. Educ. Ctrs., Inc.*, No. 14-5026, 2016 WL 2346742, at *7 (E.D. Pa. May 3, 2016) (internal quotation marks and citation omitted). "In the discipline context, a plaintiff must show that the alleged comparator's acts were of comparable seriousness to his own infraction, and that the [comparator] engaged in the same conduct without such differentiating or mitigating circumstances as would distinguish the [comparator's] conduct or the employer's resulting treatment of [him]." *Johnson v. City of Phila.*, No. 14-1123, 2015 WL 1475277, at *12 (E.D. Pa. Apr. 1, 2015) (internal quotation marks and citation omitted); *see also Wright v. Providence Care Ctr., LLC*, 822 F. App'x 85, 93 (3d Cir. 2020) ("Comparable seriousness may be shown by pointing to a violation of the same company rule, or to conduct of a similar nature." (internal quotation marks and citation omitted)). "Whether comparators are similarly situated is generally a question of fact for the jury," but summary judgment is nevertheless appropriate "where there is no evidence from which a jury could conclude the parties were similarly situated." *Abdul-Latif v. Cnty. of Lancaster*, 990 F. Supp. 2d 517, 526 (E.D. Pa. 2014) (citations omitted).

Tamburello presents five other APD employees as comparators. Pl.'s Br. 8–14, ECF No. 18. The City first argues that these comparators are inappropriate because, at the time of Tamburello's alleged misconduct, they were all tenured officers, while Tamburello was just a probationary officer. *See* Def.'s Br. 9–12. The Court addresses this overarching argument before considering each proposed comparator individually.

        *i.*     *Probationary Status*

Tamburello's probationary status does not prohibit him from using non-probationary officers as comparators. To be sure, Third Circuit precedent places some import on the distinction

between probationary employees and non-probationary or permanent employees. *See Blanding v. Pa. State Police*, 12 F.3d 1303, 1309 (3d Cir. 1993) (finding that probationary troopers were not similarly situated to non-probationary troopers where the former had "traditionally been terminated more readily" than the latter); *see also Mercado v. Donahoe*, 487 F. App'x 15, 18 (3d Cir. 2012) (finding that a non-probationary employee "was not sufficiently similar to [a probationary employee] to serve as a comparator"). District Courts have also emphasized this distinction. *See, e.g.*, *Fitchett v. Stroehmann Bakeries, Inc.*, No. 95-284, 1995 WL 560028, at *3 (E.D. Pa. Sept. 20, 1995) ("[A]s a probationary employee, [plaintiff] must point to other probationary employees who received more favorable treatment." (citations omitted)); *Dudhi v. Temple Health Oaks Lung Ctr.*, No. 18-3514, 2020 WL 996915, at *6 (E.D. Pa. Mar. 2, 2020) (holding that plaintiff's "status as a permanent employee and [the comparator's] status as a temporary worker demonstrate a meaningful difference between their employment situations"); *see also Tent v. Test Am., Inc.*, No. 10-1290, 2013 WL 1809236, at *7 (E.D. Pa. Apr. 30, 2013); *George v. Wilbur Chocolate Co., Inc.*, No. 08-cv-03893, 2010 WL 1754477, at *4 n.13 (E.D. Pa. Apr. 29, 2010); *Prentice v. OfficeMax N. Am.*, No. 9-5, 2012 WL 898323, at *8 n.10 (D.V.I. Mar. 15, 2012).

But this Court does not read those precedents as completely forbidding comparison between probationary and non-probationary employees. Such an inflexible, *per se* rule "would automatically doom" this suit, *Pantoja v. Am. NTN Bearing Mfg. Co.*, 495 F.3d 840, 846 (7th Cir. 2007), and evaluating whether comparators are similarly situated "requires a court to undertake a fact-intensive inquiry on a case-by-case basis *rather than in a mechanistic and inflexible manner*." *Monaco v. Am. Gen. Assurance Co.*, 359 F.3d 296, 305 (3d Cir. 2004) (emphasis added) (citing *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 357 (3d Cir. 1999)).

To that end, the Court finds guidance in *Boyer v. City of Philadelphia*, No. 13-6495, 2018 WL 4252378 (E.D. Pa. Sep. 6, 2018).  There, Judge DuBois observed that "where rank is irrelevant to the seriousness of the misconduct . . . [i]t would be manifestly unfair to exclude evidence of individuals who committed comparable misconduct and were disciplined by the same supervisor simply because they have a different job title or rank." *Id.* at *8.

As in *Boyer*, this Court does not find that rank is relevant to the seriousness of the alleged misconduct at issue here.  Whether Tamburello's misconduct and that of the comparators is "comparably serious," of course, poses a different question.  *See Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009) ("[P]urported comparators must have committed offenses of comparable seriousness." (internal quotation marks and citation omitted)).  But the Court is cognizant that Tamburello and several of his comparators—namely, Wittman and Marsteller—worked in the same platoon, performed the same duties, and were subject to the same rules and decision-makers for disciplinary purposes. *See infra* Sections III.A.v–vi.  Given these similarities, the probationary—permanent distinction is not dispositive on the comparator issue; it is but one factor in an otherwise fact-intensive inquiry.  *See, e.g.*, *Flores v. Pennsylvania*, No. 18-0137, 2018 WL 5884616, at *6 (E.D. Pa. Nov. 9, 2018) ("Plaintiff is not required to use other probationary troopers as comparators.").

That said, the aforementioned Third Circuit case law at least places a thumb on the scale in favor of the City's argument.  And there is some indication here that the probationary—permanent distinction matters when it comes to discipline.  Though there is no evidence, like the sort presented in *Blanding*, that the APD terminates probationary officers more readily than non-probationary officers, APD's tenured officers "are subject to greater protections" under the

10

relevant collective bargaining agreement.[8]  Def.'s Br. 10; *see* J.A. 641 ("The probationary employee shall have no rights to appeal the discipline or the termination other than through Civil Service."); J.A. 651 (recognizing that "successful completion of probationary status has significant effects on an officer's job security, including access to tenure rights and in relation to the fashion that discipline can be challenged").  With this in mind, the Court next addresses Tamburello's proposed comparators *seriatim*.

        ii.        *Detective Joshua Baker*

Detective Joshua Baker is not an appropriate comparator.  First, the record lacks specific evidence about Baker's supervisors or job responsibilities.  For example, Tamburello argues that Baker engaged in "similar duties . . . including responding to scenes, arresting suspects, and filing charges." Pl.'s Br. 13.  But this statement is made without citation to the record, which is improper at summary judgment.  *See* FED. R. CIV. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must . . . cit[e] to particular parts of materials in the record . . . ."); *see also Mojica v. Advance Auto Parts, Inc.*, No. 15-1418, 2016 WL 107844, at *5 (E.D. Pa. Jan. 11, 2016) ("It is the plaintiff's burden to put forth evidence that potential comparators are indeed similarly situated, and the plaintiff's own unsupported statements regarding the comparators' circumstances will not suffice." (citing *Warfield v. SEPTA*, 460 F. App'x 127, 130 (3d Cir. 2012))).

Second, and perhaps most importantly, Baker and Tamburello held entirely different positions, which prevents any apples-to-apples comparison between the two.[9]  *Cf. Mandel v. M &*

---

[8]    During his deposition, Tamburello could not identify any white probationary officers who, during his time at the APD, committed similar policy violations yet received more favorable treatment.  *See* J.A. 455.

[9]    Accordingly, the Court does not address Baker's alleged misconduct—though it bears emphasis that Baker, at least according to evidence in the record, was involved in only one incident, while Tamburello's misconduct spanned two separate incidents.

11

*Q Packaging Corp.*, 706 F.3d 157, 170 (3d Cir. 2013) ("[A]n employee who holds a different job in a different department is not similarly situated." (citation omitted)); *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 882 (3d Cir. 2011) (finding that proposed comparators were inappropriate because "none of them held the same position" as plaintiff).

      *iii.*    *Officer Jason Ammary*

For similar reasons, Officer Jason Ammary is not an appropriate comparator, either. As with Baker, the record lacks specific evidence about Ammary's supervisors or job responsibilities. Tamburello again argues, without citation to the record, that Ammary engaged in "similar duties . . . including responding to scenes, arresting suspects, and filing charges." Pl.'s Br. 13. This is improper. *See* FED. R. CIV. P. 56(c)(1)(A); *see also Mojica*, 2016 WL 107844, at *5.

It also bears mentioning that different decision-makers were involved in decisions about Tamburello and Ammary's employment. The City's Chief of Police at the time of Tamburello's termination, Tony Alsleben, did not hold that position at the time of Ammary's alleged misconduct. DSOF ¶ 73; PSOF ¶ 73. And the "ultimate decision" with respect to discipline "lies with the chief." J.A. 666; *see also* J.A. 668. "Employees are not considered comparable where the discipline was imposed by different decision makers," so Ammary is not a suitable comparator.[10] *Nguyen v. AK Steel Corp.*, 735 F. Supp. 2d 346, 376 (W.D. Pa. 2010) (citations omitted); *see also Parker v. Farley*, 625 F. App'x 77, 83 (3d Cir. 2015) (recognizing that it is "very difficult" for a plaintiff "to establish any inference of discrimination" where proposed comparators were disciplined by different supervisors).

---

[10] Accordingly, the Court does not address Ammary's alleged misconduct—though it bears emphasis that Ammary, at least according to evidence in the record, was involved in only one incident, while Tamburello's misconduct spanned two separate incidents.

12

*iv.* *Officer Sampson Wega*

Officer Sampson Wega is also not an appropriate comparator. Wega, like Tamburello, responded to the February 2019 burglary. *See* J.A. 69. Dashcam video shows that Wega dragged one of the suspects by the handcuffs before throwing him into a patrol car. *See* J.A. 222. Though Wega was not disciplined for his actions, Chief Alsleben and other APD officials testified that Wega had violated the use of force policy. *See* J.A. 716, 789–90, 1033–34.

Even assuming, *arguendo*, that Wega violated the use of force policy, his misconduct differs from that of Tamburello. Namely, Tamburello was charged not only with use of force violations—specifically, the misuse of deadly force in a residential neighborhood, as opposed to Wega's alleged use of excessive force—but also with lying to APD investigators and the District Attorney.[11] In other words, "[a]lthough the proposed comparator offense was a serious one, it was not sufficiently similar because it did not involve aspects of *unethical conduct or dishonesty* whereas the plaintiff's offense had." *Connearney v. Main Line Hosps., Inc.*, No. 15-02730, 2016 WL 6569326, at *6 n.7 (E.D. Pa. Nov. 4, 2016) (emphasis added) (citing *Javery v. Lockheed Martin Corp.*, No. 14-2644, 2016 WL 1642926, at *5 (E.D. La. Apr. 26, 2016)). "These offenses are different in nature and are not of 'comparable seriousness,'" so Wega and Tamburello are not similarly situated in all relevant aspects. *Boyer*, 2018 WL 4252378, at *9 (quoting *Opsatnik*, 335 F. App'x at 223).

*v.* *Officer Cory Marsteller*

As an initial matter, Marsteller and Tamburello worked in the same platoon and were subject to the same decision-makers for disciplinary purposes. *See* J.A. 667–68, 1094.

---

[11] And, as with Baker and Ammary, record evidence only shows Wega's involvement in one incident, while Tamburello's misconduct spanned two separate incidents.

Nevertheless, Marsteller is not an appropriate comparator because, unlike Tamburello, he was a tenured officer, and his alleged misconduct is far less egregious—both in quantity and severity—than that of Tamburello.

Neither Tamburello nor Marsteller activated their body-worn cameras during the February 2019 incident. *See* J.A. 166–68. But Tamburello, unlike Marsteller, was further found to have violated APD's use of force and truthfulness policies in connection with that incident. *See* J.A. 164–66. Tamburello's disciplinary record also included the policy violations stemming from the headbutt episode—an additional incident in which Marsteller was not involved. While Tamburello would have this Court make "comparisons on an incident-to-incident basis, the record reflects that [the City] terminated him based not only on the events" of February 2019, "but also on his probationary status" and his alleged misconduct in January 2019. *Maull v. Div. of State Police*, 39 F. App'x 769, 773–74 (3d Cir. 2002); *see also Simpson v. Kay Jewelers*, 142 F.3d 639, 647 (3d Cir. 1998) ("In determining whether similarly situated nonmembers of a protected class were treated more favorably than a member of the protected class, the focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action." (citation omitted)). Viewing the record as a whole, as this Court must, no reasonable jury could find that Tamburello and Marsteller are similarly situated in all relevant aspects. *See Simpson*, 142 F.3d at 645 ("[T]he evidence can not be viewed in a vacuum.").

That said, the Court still addresses Tamburello effort to equate his use of force with that of Marsteller. *See* Pl.'s Br. 10 ("Officer Marsteller and Plaintiff Tamburello engaged in the same conduct giving rise to disparate discipline."). Tamburello asserts that there is an issue of material fact as to when Marsteller discharged his weapon during the February incident. In his estimation, "the record shows that Officer Marsteller shot *after* Plaintiff Tamburello was out of the vehicle's

14

path." *Id.* at 11 (emphasis added). If that is the case, the argument goes, then Marsteller also violated the use of force policy, which forbids the discharge of firearms at moving vehicles unless "the vehicle is operated in a manner deliberately intended to strike an officer or another person and all other reasonable means of defense have been exhausted (or are not present or practical), which includes moving out of the path of the vehicle." J.A. 46; *see also* Pl.'s Br. 11.

The City counters that Marsteller discharged his firearm "at the time Tamburello was struck or within a second after he was struck." Def.'s Reply 6, ECF No. 21. In so arguing, the City invokes the principle that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also Jacobs v. Cumberland Cnty.*, 8 F.4th 187, 192 (3d Cir. 2021) ("In cases where there is a reliable video depicting the events in question, courts must not adopt a version of the facts that is 'blatantly contradicted' by the video footage." (quoting *Scott*, 550 U.S. at 380)); *Hawthorne v. Mun. of Norristown*, No. 15-01572, 2016 WL 454401, at *5 (E.D. Pa. Feb. 5, 2016) (collecting cases).

The video is inconclusive on this issue. It fails to clearly capture (1) the precise moment when Marsteller discharges his firearm and (2) Tamburello's location relative to the car when Marsteller takes his shot. *See* J.A. 170; *see also Castellani v. City of Atlantic City*, No. 13-5848, 2017 WL 3112820, at *5 (D.N.J. July 21, 2017) ("[V]ideo evidence does not blatantly contradict a non-movant's account for summary judgment purposes when there is an obstruction that 'block[s] the view of the camera' so that the video 'does not show what happened during . . . crucial moments.'" (quoting *McDowell v. Sheerer*, 374 F. App'x 288, 292–93 (3d Cir. 2010))). Even assuming, then, that Tamburello's account of events is correct, it is beyond question that

15

Tamburello, unlike Marsteller, *continued*, a total of eleven times, "to discharge his firearm at the moving vehicle after he removed himself from its path." PSOF ¶ 43 (quoting J.A. 164). Standing alone, this is the sort of differentiating circumstance that prevents Marsteller from being deemed "similarly situated" to Tamburello.

> vi.     *Officer Zachary Wittman*

At first blush, Wittman and Tamburello share some similarities: both worked in the same platoon, performed the same duties, and were subject to the same rules and decision-makers for disciplinary purposes. *See* Pl.'s Br. 8–9. But Wittman is not an appropriate comparator because, unlike Tamburello, he was a tenured officer, and his alleged misconduct is different in nature than that of Tamburello.

Neither Tamburello nor Wittman filed use of force reports following the January 2019 incident. *See* PSOF ¶ 61. But Tamburello, unlike Wittman, was further found to have used excessive force in connection with the February 2019 shooting. J.A. 164–65. There is no indication that Wittman's disciplinary record includes any firearms-related misconduct, and "the plaintiff's conduct that drew the adverse employment decision must have been 'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment decisions."[12] *Doe v. Apria Healthcare Grp. Inc.*, 97 F. Supp. 3d 638, 645 (E.D. Pa. 2015) (quoting *Lee v. Kansas*

---

[12]     For that reason, the dispute about whether Tamburello was in fact headbutted by the arrestee is immaterial. Whether Tamburello lied about the incident, as the City argues, *see* Def.'s Br. 16, or Wittman instead lied about the incident, as Tamburello argues, *see* Pl.'s Br. 9–10, Wittman did not engage in the added misconduct of violating the APD's policy concerning deadly force. And that is precisely the kind of differentiating circumstance that prevents Wittman from being deemed "similarly situated" to Tamburello. *Cf. Matthews v. Hermann*, No. 07-01318, 2008 WL 1914781, at *9 (E.D. Pa. Apr. 30, 2008) (Restrepo, J.) ("[T]he comparators' misconduct must be nearly identical to the plaintiff's in order to prevent courts from second guessing employers' reasonable decisions and confusing apples with oranges." (quoting *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001))).

*City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009)). As such, Wittman is not "similarly situated" to Tamburello.

## IV. CONCLUSION

Tamburello's comparator evidence "does not satisfy the fourth prong of the *prima facie* case. Therefore, summary judgment is proper." *Foye v. SEPTA*, No. 15-1036, 2017 WL 1150259, at *6 (E.D. Pa. Mar. 28, 2017); *see also Ashley v. Bayhealth Med. Ctr., Inc.*, 869 F. Supp. 2d 544, 552 n.9 (D. Del. 2012) ("Failure to make out a prima facie case will result in a judgment for the defendant." (citing *Pivirotto*, 191 F.3d at 352)). An appropriate order follows.

BY THE COURT:

*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge